# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MEGAN GUNTER, Administratrix of the Estate of Albert Gunter, Decedent, et al., <br><br>           Plaintiffs, <br><br>      v. <br><br> THE TOWNSHIP OF LUMBERTON, et al., <br><br>           Defendants. | Civil No. 07-4839 (NLH/KMW) <br><br> **OPINION** |

**APPEARANCES**:

Jeremy M. Walker, Esquire
Bennett, Kuhlmann & Walker, L.L.C.
100 South Broad Street
Suite 2130
Philadelphia, Pennsylvania 19110
      *and*
Robert H. Bembry, III, Esquire
100 South Broad Street
Suite 1530
Philadelphia, Pennsylvania 19110
      *Attorneys for Plaintiff Megan Gunter*

John Charles Gillespie, Esquire
Yves C. Veenstra, Esquire
Parker McCay, P.A.
Three Greentree Centre
7001 Lincoln Drive West
P.O. Box 974
Marlton, New Jersey 08053
      *Attorneys for Defendants The Township of Lumberton,*
      *Douglas W. Lemyre, Robert J. Slocum, Paul M. Craig,*
      *Ronald J. Sanna, and Bryan H. Norcross*

Michael L. Mouber, Esquire
Greentree Executive Campus
4001F Lincoln Drive West
Marlton, N.J. 08053
      *Attorney for Defendants Douglas W. Lemyre, Robert J. Slocum,*
      *Paul M. Craig, Ronald J. Sanna, and Bryan H. Norcross*

**HILLMAN, District Judge**

This matter comes before the Court by way of Plaintiff's motion [Doc. No. 89] for reconsideration of the Court's November 7, 2011 Amended Order granting in part and denying in part Defendants' motion [Doc. No. 73] for summary judgment.  Also before the Court is a motion [Doc. No. 88] by Defendants Township of Lumberton, Douglas W. Lemyre, Robert J. Slocum, Paul M. Craig, Ronald J. Sanna, and Bryan H. Norcross similarly seeking reconsideration of the Court's November 7, 2011 Amended Order and also seeking summary judgment with respect to newly raised issues in this case outlined in a hearing on November 1, 2011.

The Court has considered the parties' submissions, and decides this matter pursuant to Federal Rule of Civil Procedure 78.  For the reasons expressed below, Plaintiff's motion for reconsideration is denied, and Defendants' motion for reconsideration and summary judgment is granted.

**I.   JURISDICTION**

In this action, Plaintiff brought federal constitutional claims pursuant to 42 U.S.C. § 1983, as well as claims under New Jersey state law.  This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331, and may exercise supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. § 1367.

## II.   <u>BACKGROUND</u>

### A.   Background Presented on Defendants' Original Motion for Summary Judgment

In this case, Plaintiff Megan Gunter, daughter of the decedent, Albert Gunter, and administratrix of his estate, brought suit against Defendants, the Township of Lumberton, Douglas W. Lemyre, Sergeant Robert J. Slocum, Corporal Paul M. Craig, Patrolman Ronald J. Sanna, and Patrolman Bryan H. Norcross.  Plaintiff originally alleged violations of Albert Gunter's (or, "the Decedent") federal constitutional rights, as well as a claim under New Jersey's Wrongful Death Act, N.J.S.A. § 2A:31-1 *et seq*.  Plaintiff's claims arise out of the events which occurred in the early morning hours of November 10, 2006 and ended tragically with death of Albert Gunter.

As presented in the parties' briefing on Defendants' original motion for summary judgment, the record reveals that on or around the late evening hours of November 9, 2006, Albert Gunter was in the garage of the home of his nephew, Larry Gunter, Jr., making loud noises, and that Albert Gunter refused to stop despite Larry's request.  Earlier that same day, Albert was disruptive and had engaged in a minor physical altercation with Larry, which led to Albert tumbling down a couple of stairs.  After Albert Gunter refused Larry's request to quiet down, Larry called for emergency services to assist in removing his uncle from his home.  During his 9-1-1 call, Larry explained that

Albert was out of control, loud, and intoxicated, and had an outstanding warrant.

While traveling to Larry's home, police officers were advised that, according to the caller, Albert had an outstanding warrant.[1]  Around 1:30 a.m., on the morning of November 10th, Patrolman Norcross arrived at Larry's home, joined soon thereafter by Sergeant Slocum and Patrolman Lemyre.[2]  According to Norcross, Larry informed him that Albert had been drinking alcohol, had a history of drug use, and had an outstanding warrant.  Larry asked the officers to remove his uncle from the premises.  The officers heard Albert yelling, banging, and making loud grunting noises in the garage.  Patrolmen Norcross and Lemyre ordered Albert to step away from the interior garage door so that they could enter the garage from inside Larry's home.  Sergeant Slocum remained with Larry while Norcross and Lemyre went into the garage with Albert.  Slocum told Larry that no matter what he heard in the garage, he was not to enter.  Upon arrival, Corporal Craig and Patrolman Sanna also entered the garage.

By the officers' accounts, Albert appeared erratic,

---

[1]According to Defendants, Albert Gunter's warrants were for driving while suspended and for an outstanding charge of violating N.J.S.A. § 2C:29-2(a)(1) (resisting arrest).

[2]Lemyre was a patrolman with the Lumberton Police Department at the time of the incident at issue.  Due to a reduction in force in 2010, however, Lemyre's position was eliminated.

agitated, and to be sweating profusely.  Norcross and Lemyre
instructed Albert to sit down on a weight bench in the room.
Albert sat for awhile but continued to rise up from the seat
despite the officers' orders.  Albert rambled incoherently from
topic to topic and made exaggerated body and hand motions.
During his interaction with the officers, he positioned himself
in a "three-point stance" like in football, flailed his arms up
and down, and paced as he spoke.  (Defs.' Summ. J. Mot. [Doc. No.
73], Exs. I, at 30; AA, at 35.)  In an effort to notice any
contraband or potential weapons, the officers looked around the
garage.  They noticed empty beer cans, drug paraphernalia,[3] and
drug residue, along with lumber, tools, weights, and other
potentially dangerous objects.  In response, Albert attempted to
focus the officers' attention on him, asking, "What are you
looking at?", "Don't look at that, look at me," "Talk to me," and
"Don't you want to talk to me?"  (Defs.' Summ. J. Mot. [Doc. No.
73], Ex. Y, at 24.)  Corporal Craig moved toward the exterior
garage door and, and concerned about Albert's behavior, hid his
handcuffs behind his back.

Patrolman Lemyre returned inside Larry's home and informed
Sergeant Slocum that they intended to take Albert into custody.

---

[3] According to the Burlington County Forensic Science
Laboratory Certified Laboratory Report, the paraphernalia
identified by the officers in Albert Gunter's presence in the
garage tested positive for cocaine and marijuana.

According to Lemyre, he asked Larry if Albert had been drinking
or using narcotics; Larry confirmed that Albert had been imbibing
beer and may have smoked crack cocaine.  Thereafter, Lemyre and
Slocum entered the garage.  Lemyre approached Albert and advised
him that he was under arrest.  Albert objected, repeating "no,
no, no" and saying "You're not going to do this to me."[4]  (Defs.'
Summ. J. Mot. [Doc. No. 73], Exs. W, at 96; AA, at 36.)  Albert
then physically resisted by pulling away from and pushing Lemyre,
and flexing his muscles and disallowing the officers to place his
hands behind his back.  Lemyre and Gunter engaged in a physical
altercation, with Lemyre delivering several punches and a knee to
Gunter's body.  Corporal Craig and Patrolman Sanna tried to
intercede and take Gunter to the ground.  Patrolman Norcross also
engaged Gunter by grabbing his left arm and executing a leg sweep
and arm drag to take him to the ground.  The officers and Gunter
fell to the floor.  Gunter flailed his arms and legs, punching
and kicking at the officers.  To subdue Gunter, Craig struck him
with his fist about three times in the face, but Albert responded
by saying, "Yeah, hit me again."  (Defs.' Summ. J. Mot. [Doc. No.
73], Ex. AA, at 36.)  Craig punched him again.  The strikes
appeared to have no effect on Gunter.

---

[4] In his statement given to the Burlington County
Prosecutor's Office on November 10, 2006, Larry Gunter recalled
that during the arrest he heard Albert Gunter yelling at the
officers, "I'm not going, you're not gonna take me alive[.]"
(Defs.' Summ. J. Mot. [Doc. No. 73], Ex. HH, at 184.)

Gunter continued to resist arrest, disregard orders, and brawl with the officers.  He attempted to push himself off the ground with the officers on top of him and, on a couple occasions, tossed Craig off of him.  Norcross and Slocum tried to secure Gunter's legs and feet but failed.  With Gunter resisting while on his hands and knees, Craig struck Gunter's left leg and side with his knee, but Gunter did not relent.  Lemyre employed pepper spray against Gunter, but to no avail.  Due to the discharge of pepper spray, one of the officers eventually opened the exterior garage door.  Gunter tossed Craig off of him and told the officers, "If I'm gonna die, you're all gonna die." (Defs.' Summ. J. Mot. [Doc. No. 73], Ex. AA, at 37.)

Lemyre, Sanna, and Craig each attempted to restrain Gunter and keep him on the ground, but Gunter continued to resist. Craig discharged pepper spray directly into Gunter's face, but again it did not phase him.  The officers rolled him onto his stomach, and Craig, with Lemyre's assistance, handcuffed Gunter's left wrist.  Sanna secured Gunter's right wrist with a handcuff. Eventually, in spite of Gunter's resistance, the officers managed to handcuff his hands together.  Gunter continued to flail and kick at the officers, and tried to maneuver his knees underneath him so that he could get up.  Norcross attempted to lay across Gunter's legs, but could not do it.  Craig struck Gunter's leg with his fist, but Gunter continued to resist.  Sanna tried to

push Gunter back to the ground and sprayed him with pepper spray.

The officers attempted to secure Gunter's legs together, but he repeatedly snapped the flex cuffs they used.  Gunter resisted the officers' attempts to subdue him, angrily swore at them, and smeared his face in blood that accumulated on the floor.  Lemyre, however, had moved Gunter's head to ensure that he could breathe.

From his vehicle Sanna retrieved three more sets of handcuffs with the intent to connect Gunter's belt to the flex cuffs restraining his legs.  At one point, the officers also tried to use a white leather belt on the floor to inhibit Gunter's legs.  Sanna delivered several blows with his fist to Gunter's right leg to try to control it.  After several attempts, the officers finally were able to secure Gunter's hands and legs. Overall, the process of arresting Gunter endured approximately twelve minutes.  During the fray, the officers noticed a bleeding laceration on Gunter's forehead.  Officer Lemyre called for emergency services.  After Gunter had been restrained, Lemyre checked on Gunter's respiration and ensured that he could breathe.  The officers retrieved medical supplies from their vehicles to treat Gunter's cut.  Gunter continued to threaten and insult the officers.

As the officers treated Gunter's wound, he no longer struggled, and gasped a few breaths.  The officers then noticed that Gunter ceased to move.  They checked his pulse and observed

that Gunter had stopped breathing.  The officers removed the restraints and attempted, unsuccessfully, to revive Gunter.

During their depositions and statements, Larry and his wife, Theresa Gunter (collectively, "the Gunters"), attested to certain facts that were omitted by the officers or differed from their testimony and reports.  For example, the Gunters recalled that during the altercation between Albert and the officers, Albert yelled for Larry and Theresa.  Also, after the exterior garage door had been opened, the Gunters went outside so they could view the altercation inside the garage.  Larry saw Albert restrained on the ground, conscious, and with blood underneath his head. Theresa also noticed that Larry was bleeding, moaning, and having difficulty breathing.  When Larry and Theresa, a professional nurse, each stepped forward to check on Albert, both were told by officers to step back and not get involved, or risk arrest. Theresa asked the officers to call for an ambulance.  According to Larry, at the end of the altercation, once the officers had hogtied Albert, they left him on the floor for approximately ten or fifteen minutes before checking on him or calling for emergency services.  Larry asserts that once the officers finally checked him, the officers learned that Albert Gunter did not have a pulse and was unresponsive and then contacted the paramedics.

Paramedics arrived at the scene and escorted Albert to the hospital.  Despite attempts to revive him, Gunter was pronounced

dead around 2:26 a.m.  Following his death, a coroner documented
between fifteen to twenty contusions, bruises, and abrasions on
his body.  On his amended certificate of death, the immediate
cause of Albert Gunter's death reads, "EXCITED DELIRIUM DUE TO
COCAINE," and a contributing cause is listed as "STRUGGLE DUE TO
COCAINE TOXICITY."  (Defs.' Summ. J. Mot. [Doc. No. 73], Ex. C.)

### B.   Relevant Procedural History

Plaintiff's complaint originally alleged five counts, the
following three of which are relevant here:[5] (1) a Monell claim
pursuant to 42 U.S.C. § 1983 against the Township of Lumberton
for failure to adequately train and supervise its officers under
("Count One" or "Monell Claim"); (2) a claim for excessive force
pursuant to 42 U.S.C. § 1983 against the five Defendant Lumberton
police officers ("Count Three" or "Excessive Force Claim"); and
(3) a claim for wrongful death under New Jersey state law ("Count
Four" or "Wrongful Death Claim").  (See Pl.'s Br. in Supp. of

---

[5]Count Two of Plaintiff's original complaint was alleged
against the County of Burlington and the Burlington County Police
Academy.  (Pl.'s Compl. [Doc. No. 1] ¶¶ 36-46.)   Plaintiff
stipulated to the dismissal with prejudice of these Defendants on
December 18, 2008.  (See Stipulation of Dismissal [Doc. No. 37]
1.)  Accordingly, the Court does not address the claims alleged
in Count Two of the complaint.
     Count Five of the original complaint alleged a claim on
behalf of Larry Gunter against all Defendants for emotional
distress.  (Pl.'s Compl. [Doc. No. 1] ¶¶ 59-60.)  The parties
stipulated to the dismissal with prejudice of this claim on
November 20, 2008.  (See Stipulation and Order [Doc. No. 36] 1-
2.)  Accordingly, the Court also does not address the claims
alleged in Count Five of the complaint.

Reconsideration [Doc. No. 89] 1; <u>see also</u> Pl.'s Compl. [Doc. No.
1] ¶¶ 25-35, 47-56, 57-58.)

On November 1, 2011, the Court conducted a hearing in this
matter in relation to a September 30, 2011 Order which originally
denied Defendants' motion [Doc. No. 73] for summary judgment.  At
the November 1, 2011 hearing, the Court clarified the denial of
summary judgment with respect to certain claims.

(1) <u>*Excessive Force Claim*</u>

At the November 1, 2011 hearing, the Court amended the
September 30, 2011 Order and granted summary judgment with
respect to Count Three - Plaintiff's Excessive Force Claim
finding that "as it relate[d] to the use of excessive force, at
least up until the point that ... Mr. Gunter was restrained, ...
there [were] no material issues of fact on that aspect of
plaintiffs' claim."  (Hearing Tr. [Doc. No. 90]  4:18-22, Nov. 1,
2011; <u>see also</u> <u>id.</u> at 17:17-20.)  The Court did not find "any
evidence to suggest that the officers were unreasonable in
initiating -- or responding to [Albert Gunter's] resisting arrest
with some reasonable force to restrain him, including the use of
leg restraints when he continued to kick after being handcuffed."
(<u>Id.</u> at 7:23-8:2.)  The Court confirmed these findings in its
November 7, 2011 Order.  (<u>See</u> Order [Doc. No. 87] 2, Nov. 7,
2011.)

However, the Court expressed concerns at the November 1,

11

2011 hearing "about the material issues of fact as to when [Mr. Gunter] was finally restrained, how ... the officers responded after that event." (Id. at 9:15-17.) The Court framed the issue as follows, was Albert Gunter:

> left on the floor to die for 15 minutes while he was
> breathing, and [Defendants] refused a reasonable
> request to help from someone who is trained in
> medicine ... or, after having restrained him, [did
> Defendants] immediately call[] the EMTs, and [thus
> Mr. Gunter's] death ... is simply an unfortunate,
> unintended, and tragic consequence of a violent
> struggle?

(Id. at 12:3-10.) The Court concluded that these "two very different scenarios, ... meant that there was a material issue of fact that needed to be resolved" relating to whether or not there was a "constitutionally unreasonable deprivation of medical attention" after Mr. Gunter was restrained. (Id. at 12:11-13, 16:19-24.) Accordingly, the Court invited the parties to file motions for reconsideration or renewed motions for summary judgment to argue whether such a claim relating to an unreasonable deprivation of medical care was properly preserved by Plaintiff throughout the course of this litigation and if so, whether such a claim could survive summary judgment. (Id. at 11:15-22.)

Thus, summary judgment was granted in favor of the five Defendant police officers on Plaintiff's Excessive Force Claim as alleged in Count Three and this claim was dismissed with prejudice to the extent Plaintiff alleged that the forced used by

12

the Defendant officers were excessive up to the point where Mr. Gunter was restrained. However, the Court left open the issue of whether the Defendant officers acted unreasonably with regard to ensuring that Mr. Gunter received prompt medical care after he was restrained, and whether Plaintiff properly preserved that claim.

### (2) *Monell Claim*

Defendants' original motion also sought summary judgment on Count One – Plaintiff's Monell Claim. Plaintiff did not oppose summary judgment against Defendant the Township of Lumberton on that claim. (Pl.'s Rule 56.1 Statement [Doc. No. 76-1] 2; see also Pl.'s Br. in Supp. of Reconsideration [Doc. No. 89] 2.) At the November 1, 2011, the Court therefore also granted summary judgment in favor of Defendant the Township of Lumberton on Plaintiff's Monell Claim under Count One. (Hearing Tr. 17:21-23, 18:8-9.) However, the grant of summary judgment in favor of Defendant the Township of Lumberton was inadvertently omitted from the Court's November 7, 2011 Amended Order. An order consistent with this Opinion will amend the November 7, 2011 Amended Order to properly reflect that summary judgment was entered in favor of Defendant the Township of Lumberton on Plaintiff's Monell Claim which was dismissed with prejudice.

### (3) *Wrongful Death Claim & Punitive Damages*

The Court's November 7, 2011 Order also denied summary

13

judgment with respect to Plaintiff's Wrongful Death Claim as alleged in Count Four.  (Order [Doc. No. 87] 2, Nov. 7, 2011.) The Court noted at the November 1, 2011 hearing that there was potentially a "material issue of fact as to whether or not there had been [a] promise of continuing financial support for the plaintiff[]."  (Hearing Tr. 17:24-25.)

    In the original motion for summary judgment, Defendants also sought summary judgment to the extent Plaintiff sought punitive damages on all of her remaining claims.  Specifically, Defendants requested that all punitive damage claims against all Defendants be dismissed.  Plaintiff's did not oppose the dismissal of all punitive damage claims in this case.  (See generally Pl.'s Response Br. in Opp'n to Defs.' Mot. for Summ. J. [Doc. No. 76-2] 1-23.)  Accordingly as set forth at the November 1, 2011 hearing, the Court's November 7, 2011 Order also granted summary judgment in favor of Defendants with respect to all claims for punitive damages by Plaintiff finding that Plaintiff failed to oppose the punitive damages issue on summary judgment and therefore the issue was waived.  (Order [Doc. No. 87] 3, Nov. 7, 2011.)


**III. DISCUSSION**

    In the present motions, both parties seek reconsideration of various aspects of the Court's November 7, 2011 Amended Order. Defendants also seek summary judgment on the potential claim that

14

there was an unreasonable deprivation of medical care to Mr. Gunter after reasonable force was used to restrain him.

## A.  Motions for Reconsideration

In this district, motions for reconsideration are governed by Local Civil Rule 7.1(i), which provides in relevant part, that "[a] motion for reconsideration shall be served and filed within 14 days after the entry of the order or judgment on the original motion by the Judge or Magistrate Judge."  L. Civ. R. 7.1(i). Rule 7.1(i) further provides that the party moving for reconsideration must submit a "brief setting forth concisely the matter or controlling decisions which the party believes the Judge or Magistrate Judge has overlooked[.]"  L. Civ. R. 7.1(i). A motion for reconsideration under Rule 7.1(i) is "'an extremely limited procedural vehicle,' and requests pursuant to th[is] rule[] are to be granted 'sparingly.'"  Langan Eng'g & Envtl. Servs., Inc. v. Greenwich Ins. Co., No. 07-2983, 2008 WL 4330048, at *1 (D.N.J. Sept. 17, 2008) (citing P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp., 161 F. Supp. 2d 349, 353 (D.N.J. 1992)).

The purpose of a motion for reconsideration "'is to correct manifest errors of law or fact or to present newly discovered evidence.'"  Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999) (citation omitted). In seeking reconsideration, the moving party bears a heavy burden and the motion can only be granted if the party "shows at least

one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." Id.

However, reconsideration is not appropriate where the motion only raises a party's disagreement with the Court's initial decision. Florham Park Chevron, Inc. v. Chevron U.S.A., Inc., 680 F. Supp. 159, 163 (D.N.J. 1988); see also Schiano v. MBNA Corp., No. 05-CV-1771, 2006 WL 3831225, *2 (D.N.J. Dec. 28, 2006) ("Mere disagreement with the Court will not suffice to show that the Court overlooked relevant facts or controlling law, ..., and should be dealt with through the normal appellate process[.]") (citations omitted); United States v. Compaction Sys. Corp., 88 F. Supp. 2d 339, 345 (D.N.J. 1999) ("Mere disagreement with a court's decision normally should be raised through the appellate process and is inappropriate on a motion for [reconsideration]."). Accordingly, "courts in this District routinely deny motions for reconsideration that simply re-argue the original motion." Altana Pharma AG v. Teva Pharm. USA, Inc., No. 04-2355, 2009 WL 5818836, at *1 (D.N.J. Dec. 1, 2009).

**B.   Motion for Summary Judgment**

Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any,
show that there is no genuine issue as to any material fact and
that the moving party is entitled to a judgment as a matter of
law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)
(citing Fᴇᴅ. R. Cɪᴠ. P. 56).

An issue is "genuine" if it is supported by evidence such
that a reasonable jury could return a verdict in the nonmoving
party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986). A fact is "material" if, under the governing
substantive law, a dispute about the fact might affect the
outcome of the suit. Id. "In considering a motion for summary
judgment, a district court may not make credibility
determinations or engage in any weighing of the evidence;
instead, the nonmoving party's evidence 'is to be believed and
all justifiable inferences are to be drawn in his favor.'"
Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)
(citing Anderson, 477 U.S. at 255).

Initially, the moving party bears the burden of
demonstrating the absence of a genuine issue of material fact.
Celotex, 477 U.S. at 323 ("[A] party seeking summary judgment
always bears the initial responsibility of informing the district
court of the basis for its motion, and identifying those portions
of 'the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any,' which

it believes demonstrate the absence of a genuine issue of material fact." (citation omitted); <u>see also</u> <u>Singletary v. Pa. Dept. of Corr.</u>, 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by "showing" -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof.") (citing <u>Celotex</u>, 477 U.S. at 325).

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. <u>Celotex</u>, 477 U.S. at 324.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  <u>Anderson</u>, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001).

IV.  **<u>ANALYSIS</u>**

    A.  **Plaintiff's Motion for Reconsideration**

In the present motion, Plaintiff seeks reconsideration of

18

the grant of summary judgment in favor of the Defendant officers
on Plaintiff's Excessive Force Claim as alleged in Count Three
with regard to the force used up to the point when Albert Gunter
was physically restrained.  Plaintiff contends that
reconsideration is necessary to correct a clear error of law and
prevent manifest injustice.  (Pl.'s Br. in Supp. of
Reconsideration [Doc. No. 89] 3.)  Plaintiff also seeks
reconsideration of the Court's grant of summary judgment with
respect to all of Plaintiff's claims for punitive damages
including those made against the individual officer Defendants.
(Id. at 6.)  Plaintiff argues that this claim for punitive
damages against the individual officer Defendants was addressed
in response to the original summary judgment motion on the
Excessive Force Claim and was not abandoned.  (Id.)  As set forth
below, Plaintiff has not satisfied her burden to demonstrate that
reconsideration is warranted on either issue.

### (1) *Excessive Force Claim*

In granting summary judgment in Defendants' favor on the
Excessive Force Claim, the Court previously found as a matter of
law based on the parties' submissions and the record at that
time, that the Lumberton police officer Defendants did not act in
a manner that was objectively unreasonable, and did not use
excessive force, when dealing with Albert Gunter.  As a threshold
matter, the officers' initial seizure of the Decedent was

reasonable, and was not seriously disputed on the motion for summary judgment.  The Defendant officers went to Larry Gunter's home to confront the Decedent in response to Larry's 9-1-1 call seeking assistance.  Larry Gunter requested emergency services to have his uncle, who had been acting unruly and inappropriately, removed from his home.  The officers responded to that call and, in the process, learned that the Decedent had an outstanding warrant and could be intoxicated.  Upon arrival at Larry Gunter's home, the officers interacted with the Decedent and found his actions and demeanor to be unusual, erratic, and, at times, aggressive.  Among other things, the Decedent entered a "three-point stance" and made exaggerated body and arm motions.  On occasion, the Decedent ignored police orders, such as to sit and remain on the weight bench.  Furthermore, the officers observed, *inter alia*, drug paraphernalia in the garage, in the Decedent's immediate presence.  They had reason to believe that the Decedent, given his strange behavior, was intoxicated or under the influence of a controlled dangerous substance.  Based on Larry Gunter's request to have his uncle removed from the home, their knowledge of an outstanding warrant, and their own firsthand observations, the officers had a sufficient basis to take Albert Gunter into custody.

As for the physical force employed by the officers, Plaintiff presented no credible facts, evidence, or arguments to

20

countervail, as a matter of law, the reasonableness of the
Defendant officers' actions under the circumstances or to
otherwise establish a constitutional violation.  The officers
informed Albert Gunter that he was under arrest.  Immediately,
Gunter -- who stood at least six feet tall, weighed about 210
pounds, and was described by officers as muscular and strong --
initiated the melee by resisting arrest and refusing to allow the
officers to take him into custody.  The officers grabbed at and
struck Gunter in their efforts to subdue him and to defend
themselves against his attacks.  They testified that throughout
their interactions with him, and until he was completely
restrained, Gunter continued to resist arrest, to toss them off
of his person, and to flail and strike the officers with his arms
and legs.  Even while on the ground, Gunter continued to fight
the police.  Using their hands and knees, the officers struck
Gunter's face, body, and legs, and during the course of the
struggle, they discharged pepper spray into Gunter's face three
times, all in their attempts to quell his relentless resistance.
However, those strikes, intended as both defense for the officers
and to gain Gunter's compliance, did not seem to affect Gunter,
who continued to struggle.  Once the officers had him on the
ground and cuffed, Gunter still cursed at them and struggled,
kicking at the officers and snapping several pairs of flex cuffs
applied to his feet.  The officers' endeavor to subdue and arrest

the Decedent endured for approximately twelve minutes and rendered the officers physically exhausted.

In the end, all of those actions taken by the officers occurred in light of Gunter's persistent resistance and refusal to allow the officers to arrest him.  The number and severity of blows sustained by Gunter correspond proportionately to the duration and threat of his active resistance to the officers and the fact that, while under the ostensible influence of narcotics, he physically battled them from the moment they attempted to arrest him until they finally could encumber his hands and legs completely with restraints.  The fact that Gunter suffered some injuries and died, tragically, does not evince the use of excessive force.  See Cyrus v. Town of Mukwonago, 624 F.3d 856, 864 (7th Cir. 2010) ("[A] plaintiff cannot ask a jury to infer that an officer used excessive force based solely on the fact that an injury occurred.  The plaintiff must instead identify the specific conduct of the officer that is alleged to be excessive and unreasonable; the fact of an injury while in police custody is not enough.").

In short, Albert Gunter presented a dangerous threat to the officers' safety and well-being and actively resisted arrest; therefore, the officers acted reasonably when they employed physical force to subdue him.  See Bornstad v. Honey Brook Twp., 211 F. App'x 118, 122-125 (3d Cir. 2007) (affirming summary

judgment in favor of defendant-officers on excessive force claim where decedent, "an imposing, intoxicated suspect," physically resisted arrest and died following skirmish with officers who employed pepper spray and force to subdue him particularly because the struggle escalated to the point where restraints employed were appropriate, and suspect himself was the cause of the escalation).  Plaintiff thus failed to demonstrate that Defendants violated Albert Gunter's Fourth Amendment right to be free of excessive force on Defendants' motion for summary judgment.

In seeking reconsideration of this determination, Plaintiff relies primarily on Cruz v. City of Laramie, 239 F.3d 1183 (6th Cir. 2001).  According to Plaintiff, Cruz demonstrates that the use of a "hog-tie" restraint on an individual with "diminished capacity" violates the individual's Fourth Amendment rights to be free from excessive force.  (Pl.'s Br. in Supp. of Reconsideration [Doc. No. 89] 3-5.)  Plaintiff alleges that, as in Cruz, it was clear to the Defendant officers that Albert Gunter was in a state of "diminished capacity" and that therefore, the use of a "hog-tie" restraint constituted excessive force.  (Id. at 5-6.)  However, a thorough review of Plaintiff's motion with regard to the excessive force issue demonstrates that Plaintiff fails to meet the burden to warrant reconsideration here.

23

To the extent Plaintiff relies on Cruz, Cruz is decision from the Sixth Circuit Court of Appeals which is not binding precedent on this Court, and is distinguishable from the present case.  Moreover, Plaintiff does not offer a sufficient explanation for failing to present this 2001 case to the Court in response to Defendants' original motion for summary judgment which was brought in 2011.  Additionally, Plaintiff does not point to any facts or circumstances that were not previously considered by the Court in granting summary judgment on the Excessive Force Claim.  While Plaintiff calls the Court's attention to certain facts related to whether Mr. Gunter was intoxicated at the time of the November 2006 incident, the Court previously took into account the fact that Mr. Gunter was intoxicated and potentially under the influence of drugs, and that the Defendant officers were aware of these facts at the time they attempted to place Mr. Gunter under arrest.  Taking those facts into consideration, the Court already found that the Defendant officers did not use excessive force in their efforts to restrain Mr. Gunter based on his continuously escalating, aggressive attempts to resist arrest which included — kicking, flailing his arms and legs, yelling at the officers, and breaking several pairs of flex cuffs, even after being sprayed with pepper spray multiple times.

It appears to the Court that with respect to this claim,

Plaintiff is merely raising her disagreement with the Court's initial decision.  However, Plaintiff's disagreement with the original decision granting summary judgment on the Excessive Force Claim is insufficient to show that the Court overlooked relevant facts or controlling law warranting reconsideration. Cf. Schiano, 2006 WL 3831225, *2.  Because Plaintiff has failed to sufficiently articulate relevant facts or controlling decisions which were presented to the Court on the original motion but overlooked, because Plaintiff simply disagrees with the entry of summary judgment in favor of Defendants on the Excessive Force Claim, and because Plaintiff merely attempts to reargue[6] that the officers use of force was excessive, her motion for reconsideration on this issue must be denied.  Altana Pharma AG, 2009 WL 5818836, at *1.

   (2) *Punitive Damages*

   Plaintiff also seeks reconsideration of that part of the Court's November 7, 2011 Amended Order which granted summary judgment in favor of all Defendants and dismissed Plaintiff's claims for punitive damages against all Defendants.  Plaintiff claims that the failure to properly and fully address this issue

---

   [6]For example, in response to Defendants' original summary judgment motion, Plaintiff argued that "there are facts from which a jury could infer that it was not reasonable for officers to strike, mace, and hog-tie [Albert Gunter] when he was on the ground that preclude granting summary judgment on Plaintiff's Excessive claim."  (Pl.'s Response Br. in Opp'n to Defs.' Mot. for Summ. J. [Doc. No. 76-2] 20.)

should be excepted based on "excusable neglect" and contends that
all four of the relevant factors the Court must consider "fit
squarely within the present case." (Pl.'s Br. in Supp. of
Reconsideration [Doc. No. 89] 6.) Specifically, Plaintiff
asserts that Defendants will not be prejudice by any delay on
Plaintiff's part. Additionally, Plaintiff contends the claim for
punitive damages against the individual Defendant officers was
not abandoned on the original motion for summary judgment. (Id.)

In this regard, Plaintiff's motion again fails to satisfy
the burden for reconsideration. Despite Plaintiff's assertion in
the present motion, Plaintiff's opposition to Defendants'
original summary judgment motion does not sufficiently address
the issue of punitive damages in any substantive manner. To the
extent Plaintiff argued that summary judgment should not be
granted on the Excessive Force Claim, that argument alone is not
adequate to counter Defendants' independent legal argument that
Plaintiff was not entitled to punitive damages from any
Defendant. With respect to the individual officers, Defendants
argued that Plaintiff failed to establish any facts supporting
the "malicious or evil intent or callous disregard" requirement
necessary to support a punitive damage award under Section 1983.
(Defs.' Summ. J. Mot. 38.) In opposing the motion for summary
judgment, Plaintiff did not adequately address this issue either

26

directly or indirectly.[7]  Accordingly, the Court properly
dismissed Plaintiff's punitive damage claims, and Plaintiff fails
to provide an adequate basis for reconsideration.

As set forth above, Plaintiff's motion [Doc. No. 89] will
therefore be denied in its entirety.

**B.    Defendants' Motion for Reconsideration and Summary
        Judgment as to Newly Raised Issues**

Defendants' motion [Doc. No. 88] seeks reconsideration of
two issues.  First, Defendants seek reconsideration to the extent
the November 7, 2011 Amended Order inadvertently omitted the
grant of summary judgment in favor of Defendant the Township of
Lumberton on Count One of Plaintiff's complaint alleging a Monell
Claim.  As set forth supra, Plaintiff did not oppose summary
judgment as to this claim and the Court granted summary judgment
on the Monell Claim at the November 1, 2011 hearing.
Accordingly, Defendants' motion for reconsideration is granted
with respect to this issue.

Second, Defendants argue that reconsideration is warranted
on the denial of summary judgment as to Plaintiff's Wrongful
Death Claim.  Defendant argues that in light of the Court's
finding that Defendants did not use excessive force in
restraining Albert Gunter, Plaintiff cannot, as a matter of law,

---

[7]The only mention of the term damages in Plaintiff's
opposition was made in reference to her Wrongful Death Claim, not
the issue of punitive damages.  (Pl.'s Response Br. in Opp'n to
Defs.' Mot. for Summ. J. [Doc. No. 76-2] 20.)

establish the required elements of a claim for wrongful death:
(1) a wrongful act by Defendants causing the death and (2) that
Albert Gunter would have been able to maintain an action for
damages if he had survived.  (Defs.' Br. in Supp. of
Reconsideration and Summ. J. [Doc. No. 88-1] 20.)

　　　　Pursuant to New Jersey's Wrongful Death Act,

> When the death of a person is caused by a
> wrongful act, neglect or default, such as
> would, if death had not ensued, have entitled
> the person injured to maintain an action for
> damages resulting from the injury, the person
> who would have been liable in damages for the
> injury if death had not ensued shall be liable
> in an action for damages, notwithstanding the
> death of the person injured and although the
> death was caused under circumstances amounting
> in law to a crime.

N.J.S.A. § 2A:31-1.  "To assert a cause of action for wrongful
death, Plaintiffs must assert (1) that Plaintiff's death was
caused by a wrongful act, and (2) that Plaintiff would have been
able to maintain an action for damages had he survived."  Davis
v. Twp. of Paulsboro, 2005 U.S. Dist. LEXIS 9881, at *57 (D.N.J.
May 24, 2005) (citing Miller v. Estate of Sperling, 766 A.2d 738,
741 (N.J. 2001)).

　　　　Plaintiff does not offer an adequate, substantive argument
in opposition to Defendants' motion for reconsideration on the
issue of the Wrongful Death Claim.  Plaintiff appears to simply
rely on her continuing assertion that Defendants use of force in
restraining Albert Gunter was excessive.  (See, e.g., Pl.'s

Response Br. in Opp'n to Defs.' Mot. for Summ. J. [Doc. No. 76-2]
22-23) (asserting that "Plaintiff has addressed the 'wrongful
act, neglect or default' in plaintiff's response regarding
defendants' use of excessive force and will rely upon the
argument set forth above."). However, as set forth supra, the
Court has already ruled against Plaintiff on that issue.

As the complaint makes clear, Plaintiff's Wrongful Death
Claim is premised solely on the use of force by Defendants which
Plaintiff alleges lead to Mr. Gunter's death. Plaintiff's
primary allegation in support of the Wrongful Death Claim is that
"[w]hile tackling Albert Gunter, striking, and spraying him with
mace, Defendant[s] ... caused Albert Gunter's death." (Pl.'s
Compl. [Doc. No. 1] ¶ 58.) Having already determined that
Defendants' did not use excessive force in restraining Albert
Gunter, the Court now finds, based on the allegations of the
complaint and the record at this time, that Plaintiff cannot, as
a matter of law, demonstrate a wrongful act on the part
Defendants which lead to Mr. Gunter's death. Similarly, where
the Court has already concluded that Defendants did not use
excessive force, it is also clear that Plaintiff cannot, as a
matter of law, demonstrate that had Albert Gunter survived, he
would have been able to maintain an action for damages on an
excessive force claim. Accordingly, Plaintiff cannot satisfy the
requirements of the New Jersey Wrongful Death Act.

In this circumstance, reconsideration is warranted to correct a clear error of law because Plaintiff cannot establish the required elements of a claim for wrongful death under New Jersey law.  As a result, the Court grants summary judgment in favor of Defendants on this claim and dismisses the claim with prejudice at this time.[8]

Having resolved the two issues Defendants raised on their motion for reconsideration, the Court now turns to the sole remaining issue in this case – whether Defendants are entitled to summary judgment on a claim for an unconstitutional deprivation of medical care to Albert Gunter.  As noted at the November 1, 2011 hearing, the Court concluded that there was a material issue of fact with regard to whether there was an unconstitutional deprivation of medical care by Defendants after the point at which Albert Gunter was restrained.  The Court specifically asked the parties to demonstrate the time line of events in the early morning hours of November 10, 2006 in order to determine whether Defendants acted promptly in response to Mr. Gunter's medical needs or whether they delayed providing, and calling for, necessary care.  Defendants initially challenge whether such a

_____

[8]To the extent the Court previously noted at the November 1, 2011 hearing that there was a "material issue of fact as to whether or not there had been [a] promise of continuing financial support for the plaintiff[]", (see Hearing Tr. 17:24-25), that fact is no longer relevant to the Court's analysis because Plaintiff cannot establish the required elements of a Wrongful Death Claim as set forth supra.

claim was adequately plead in Plaintiff's complaint and preserved throughout the course of this litigation.  However, the Court will assume for purposes of this motion that Plaintiff did adequately preserve such a claim.  Even making this assumption in Plaintiff's favor that a deliberate indifference claim for failing to provide prompt medical care was preserved, the record demonstrates that there is no longer a genuine issue of material fact with regard to the time line of events on November 10, 2006 and Defendants are entitled to summary judgment on this issue.

As the Third Circuit has recognized, "an arrestee in the custody of government officials, ... [is] required to be given medical care for his wounds." Jennings v. Fetterman, 197 F. App'x 162, 165 (3d Cir. 2006)(citing Monmouth County Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 n. 31 (3d Cir. 1987)).  Therefore, "[d]enial or delay of such care can constitute 'deliberate indifference to a serious medical need,' as proscribed by the Eighth and Fourteenth Amendments." Jennings, 197 F. App'x at 165 (citing Monmouth, 834 F.2d at 346-47).  Deliberate indifference can be demonstrated in a number of ways including: (1) where the denial of reasonable requests for medical treatment exposes plaintiff to undue suffering or the threat of tangible residual injury; (2) where defendants had knowledge of the need for medical care and intentionally refused to provide that care: (3) where necessary medical treatment is

31

delayed for non-medical reasons; (4) where government officials erect arbitrary and burdensome procedures that cause interminable delays and outright denials of medical care to suffering inmates; and (5) where government authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to physician capable of evaluating the need for such treatment.  <u>Monmouth</u>, 834 F.2d at 346-47 (citations omitted).

In seeking summary judgment on this claim, Defendants have presented evidence demonstrating the following time line of events.[9]  Larry Gunter's original call to 9-1-1 occurred at 1:29 a.m. on November 10, 2006.  The first officer arrived on the scene one minute later at 1:30 a.m.  The last officer, Officer Sanna, arrived on the scene at 1:40 a.m., eleven minutes after

---

[9]In support of this time line, Defendants submitted the Certification of Acting Chief of Police for Lumberton Township Anthony DiLoreto to aid the Court's interpretation of true and accurate copies of the computer aided dispatch incident and defibrillator reports for November 10, 2006.  Chief DiLoreto has certified that "[t]hese reports were created independently by the Burlington County Central Communication or automatically by the defibrillator machine and cannot be altered or adjusted by third parties" and are therefore represent reliable, independent verification for the time line set forth herein.  (DiLoreto Certification [Doc. No. 88-3] ¶¶ 5-6.) Thus, all of the information used to establish the specific time line comes from Chief DiLoreto's Certification and the reports attached thereto unless otherwise stated.
Although Chief DiLoreto's Certification uses the date of November 11, 2006, this appears to be a minor typographical error in his certification as the parties do not dispute that the events in question occurred on November 10, 2006.  Moreover, the reports submitted by Chief DiLoreto indicate that the events, including Larry Gunter's initial 9-1-1 call happened on November 10, 2006.

the initial 9-1-1 call was placed.  At that time, after speaking
with Larry Gunter and his wife Theresa, the Defendant officers
went into the garage to speak to Albert Gunter and ultimately to
take him into custody.  The parties agree that a struggle ensued
between Mr. Gunter and the Defendant officers which lasted
approximately twelve minutes until Mr. Gunter was restrained.
(See Defs.' Br. in Supp. of Mot. for Both Summ. J. on Newly
Raised Issues and Reconsideration [Doc. No. 88-1] 12; see also
Pl.'s Response Br. in Opp'n to Defs.' Mot. for Summ. J. on Newly
Raised Issues [Doc. No. 102] 4.)  Therefore, the record reflects
that the struggle commenced sometime after the last officer
arrived at approximately 1:40 a.m. and lasted until approximately
1:52 a.m. when the officers were finally able to restrain Mr.
Gunter.

     At some point during the initial course of this approximate
twelve minute struggle to subdue Mr. Gunter, who was actively and
aggressively resisting arrest, one of the Defendants executed a
leg sweep.  As a result, all of the individuals, including Albert
Gunter, lost their balance and fell, at which time Mr. Gunter
suffered a laceration on his head and began to bleed.  After Mr.
Gunter suffered this laceration, he still continued to struggle
and resist arrest.  At this point, while the other officers
continued their efforts restrain Mr. Gunter, officer Lemyre
recognized that Mr. Gunter was bleeding and thereafter called for

medical assistance (apparently referred to as calling for a
"squad") at approximately 1:43 a.m.  After the initial call for
medical assistance by Officer Lemyre, a Lumberton basic life
support ambulance[10] was dispatched one minute later at
approximately 1:44 a.m. to respond to the laceration Mr. Gunter
suffered during the struggle.

As noted above, Officer Lemyre made the initial call for
medical assistance and the basic life support ambulance was
dispatched while the struggle to restrain Mr. Gunter continued -
a struggle that lasted approximately nine more minutes after the
initial call was made at 1:43 a.m. — until sometime around 1:52
a.m.  At that time, when the officers were finally able to
restrain Mr. Gunter and the active struggled had concluded, the
officers began treating the laceration on Mr. Gunter's head.
(Pl.'s Response Br. in Opp'n to Defs.' Mot. for Summ. J. [Doc.
No. 76-2] 13.)  Shortly thereafter, Mr. Gunter took a few gasping
breaths.  (Id.)  One of the officers then observed that Mr.
Gunter was motionless and proceeded to check for pulse and
concluded that Mr. Gunter had stopped breathing.  (Id.)

At this point the officers took several steps within just a

_____

[10]According to Chief DiLoreto's Certification, a basic life
support ambulance is the typical medical service dispatched for
basic/non-life threatening injuries such as cuts and abrasions.
(DiLoreto Certification [Doc. No. 88-3] ¶ 12.)  This is different
than an advanced life support ambulance which signifies a more
serious medical need and results in a response from both
paramedic units and EMTs.  (Id.)

few moments to provide Mr. Gunter with necessary medical treatment.  First, because the basic life support ambulance had not yet arrived to treat Mr. Gunter's laceration and because Mr. Gunter was no longer breathing, Officer Craig made a second request for medical assistance at 1:53 a.m.  Officer Craig's call requested that dispatch "go to Mt. Holly" – meaning that "the officers were attempting to secure medical assistance through mutual aid from an adjacent municipality" – and also requested paramedics on the scene reflecting the need for more advanced life support at that time.  (See DiLoreto Certification [Doc. No. 88-3] ¶¶ 14-15.)  This second call for more advanced medical care came within approximately one minute of the time Mr. Gunter was restrained and the officers noticed he was not breathing.  Second, approximately two minutes later, Defendants activated the defibrillator at 1:55 a.m.[11]

During this time, Defendants had removed the restraints from Mr. Gunter and continued CPR and breathing exercises.  (See Defs.' Br. in Supp. of Mot. for Both Summ. J. on Newly Raised Issues and Reconsideration [Doc. No. 88-1] 12; see also Pl.'s Response Br. in Opp'n to Defs.' Mot. for Summ. J. on Newly Raised Issues [Doc. No. 102] 13.)  The "Heart Start" defibrillator

---

[11]Chief DiLoreto explained that although the defibrillator report states a time of 2:55 a.m. that is because the machine is not adjusted for daylight savings time thus the true time of the report is 1:55 a.m.  (DiLoreto Certification [Doc. No. 88-3] ¶ 16 n.1.)

report further indicates that Mr. Gunter had an estimated "collapse" time of 1:55 a.m., that the machine was activated at 1:55 a.m. and that it was in use until is was deactivated at 2:05 a.m.  In the meantime, the basic life support ambulance arrived on the scene at 1:58 a.m.  Subsequently, a paramedic unit was dispatched at 1:59 a.m., in route to the scene at 2:01 a.m., and arrived by 2:05 a.m.

Based on the substantial evidence presented to the Court regarding the time line of events on November 10, 2006, the Court finds that Defendants have discharged their burden as the party seeking summary judgment on a deliberate indifference claim by pointing out the absence of evidence to support Plaintiff's claim that there was any delay in responding to Mr. Gunter's medical needs.  See Singletary, 266 F.3d at 192 n.2.  Chief DiLoreto's Certification and the attached dispatch and defibrillator reports clearly indicate that despite Plaintiff's contention that the officers stood-by for fifteen minutes before even calling for paramedics, the first call for medical attention regarding the laceration on Mr. Gunter's head was made at 1:43 a.m., just three minutes after the last officer arrived on the scene, in the middle of the struggle itself, and just fourteen minutes from the time Larry Gunter placed the original 9-1-1 call.[12]

_____

[12]The Court originally framed the issue regarding medical care as follows, was Albert Gunter:

Importantly, the total time span of the incidents in question-
from Larry Gunter's 9-1-1 call at 1:29 a.m. to the arrival of the
second ambulance at 2:05 a.m.- constitutes a period of only
thirty-six minutes.  During that time, the officers responded to
Mr. Gunter's medical needs as they arose – first for the head
laceration with the call for medical assistance at approximately
1:43 a.m.- and second for advanced life support medical
assistance when Mr. Gunter became unresponsive at the conclusion
of the twelve minute struggled where he resisted arrest.

In response, Plaintiff does not offer sufficient evidence to
raise a genuine issue of material fact on this issue.
Specifically, Plaintiff only controverts Defendants' evidence as
presented in Chief DiLoreto's Certification and the attached
reports by vaguely asserting that "[t]he record is not clear on
the timing of the call for the EMT and the actual administration
of medical care to the decedent."  (Pl.'s Response Br. in Opp'n
to Defs.' Mot. for Summ. J. on Newly Raised Issues [Doc. No. 102]

---

left on the floor to die for 15 minutes while he was
breathing, and [Defendants] refused a reasonable
request to help from someone who is trained in
medicine ... or, after having restrained him, [did
Defendants] immediately call[] the EMTs, and [thus
Mr. Gunter's] death ... is simply an unfortunate,
unintended, and tragic consequence of a violent
struggle?

(Hearing Trans. at 12:3-10.)  The uncontroverted evidence
presented by Defendants demonstrates that Defendants responded
immediately and promptly in response to Mr. Gunter's need for
medical care and thus resolves the issue for the Court.

4.)  Plaintiff also alleges without any factual support that it "is a question of material fact ... When did the defendants notice the decedent was non[] responsive and when were the EMTS called?"  (Id. at 5.)  Rather than identifying specific facts and affirmative evidence for the Court that contradict those offered by the Defendants regarding the time line of that evening as is required in opposing a motion for summary judgment, see Anderson, 477 U.S. at 256-57, Plaintiff simply relies on a string of cases to argue the deliberate indifference standard and summarily concludes that "[t]he defendant officers viewed Mr. Gunter in significant physical distress, yet delayed in providing medical care for several minutes."  (Pl.'s Response Br. in Opp'n to Defs.' Mot. for Summ. J. on Newly Raised Issues [Doc. No. 102] 7.)  Such arguments amount to the type of "mere allegations, general denials, or vague statements" which are insufficient to withstand a motion for summary judgment.  See Saldana, 260 F.3d at 232.

Cases alleging excessive force by police officers that result in the death of a suspect represent difficult cases.  On the one hand, the Plaintiff has lost a loved one and the circumstances here are even more tragic given the fact that the initial call for police assistance was from a relative.  At all times in an encounter - from beginning to end - officers must use only that force which is necessary, to never retaliate, and to be

prepared to shift from enforcer to protector when the circumstances abruptly change.  On the other hand, police officers who face dangerous situations and act throughout in an objectively reasonable way must be afforded the immunity from a trial the law allows.

On the uncontroverted facts presented here, no reasonable juror could conclude that the Defendants were deliberately indifferent to Mr. Gunter's condition.  On the contrary, the only reasonable conclusion is that they did the best they could under difficult circumstances and as soon as they were able. Accordingly, to the extent Plaintiff alleged a claim regarding an unconstitutional deprivation of medical care, the Court finds that summary judgment must be granted in favor of Defendants on this claim.

V.   **CONCLUSION**

For the foregoing reasons, Plaintiff's motion for reconsideration [Doc. No. 89] is denied, and Defendants' motion for reconsideration and summary judgment on newly raised issues [Doc. No. 88] is granted.  All of Plaintiff's remaining claims are dismissed with prejudice.  An Order consistent with this Opinion will be entered.

Date:  June 29, 2012                  /s/ Noel L. Hillman
At Camden, New Jersey            NOEL L. HILLMAN, U.S.D.J.